# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| In re:<br>**Local Service Corporation,**<br>    Debtor. | Bankruptcy Case No. 08-15543-EEB<br><br>Chapter 11 |
|---|---|
| In re:<br>**John D. Watson,**<br>    Debtor. | Bankruptcy Case No. 07-21077-EEB<br><br>Chapter 7 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING MOTIONS TO APPROVE SETTLEMENT AGREEMENT

THIS MATTER comes before the Court on the Motion to Approve Settlement Agreement filed by Simon Rodriguez, as the Chapter 11 trustee for Local Service Corporation, on May 23, 2011 (Case No. 08-15543, Docket No. 249); and the Motion to Approve Settlement Agreement filed by Jeffrey A. Weinman, as the Chapter 7 trustee for the Estate of John D. Watson on May 24, 2011 (Case No. 07-21077, Docket No. 285) (collectively, the "Motions"). On October 6, 2011, the Court held a one-day evidentiary hearing regarding the Motions, and heard testimony from Jeffrey A. Weinman, Patrick Vellone, and Simon Rodriguez. The Court also admitted Exhibits A through MM and 1 through 30. Based on the evidence presented, the Court finds as follows:

### **FINDINGS OF FACT**

*Appointment of the Trustees*

1. Jeffrey A. Weinman ("Weinman" or "the Watson Trustee") was appointed as the trustee for the bankruptcy estate of John D. Watson ("Watson") in February 2008. [Case No. 07-21077, Docket No. 118.] As the representative of the Watson Estate, he succeeded to Watson's stock interest held in Local Service Corporation ("LSC").

2. Weinman became the sole board member of LSC, elected himself President, and was authorized to make decisions for LSC. LSC filed for Chapter 11 on April 25, 2008. [Case No. 08-15543, Docket Nos. 1, 3, 98.]

3. In June 2010, the U.S. Trustee's Office appointed Simon Rodriguez (the "LSC Trustee") as the Chapter 11 trustee for the LSC estate (the "LSC Estate"). [Case No. 08-15543, Docket No. 141]

    4.    Creditors substantially overlap in both cases. [Testimony of Jeffrey Weinman]

*Relevant Adversary Proceedings*

    5.    In 2008, the LSC Estate commenced Adversary Proceeding No. 08-1453 EEB against Watson's spouse, Valdonna ("Mrs. Watson"). The LSC Estate asserted fraudulent conveyance claims against Mrs. Watson relating to Watson's transfer to her of real property in Carbondale, Colorado (the "Carbondale Adversary"). [Testimony of Simon Rodriguez and Ex. A at p. 2.]

    6.    In 2008, the LSC Estate also commenced Adversary Proceeding No. 08-1454 EEB against KC Webb Properties, LLC, *et al.*, in which the LSC Estate asserted fraudulent conveyance claims relating to several parcels of real property located throughout Colorado (the "KC Webb Adversary"). [Testimony of Simon Rodriguez and Ex. GG.]

    7.    In 2008, the LSC Estate and the Watson Estate jointly commenced Adversary Proceeding No. 08-1715 EEB against Blake Industrial Park, LLC ("BIP") in which the Plaintiffs asserted fraudulent conveyance claims relating to real property located in Denver, Colorado (the "Blake Industrial Adversary"). [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. A at p. 1.]

    8.    In 2009, the Watson Trustee commenced Adversary Proceeding No. 09-1574 EEB against Mrs. Watson in which the Watson Trustee asserted fraudulent conveyance claims relating to three real properties in Breckenridge, Colorado (the "Breckenridge Mountain Estates Adversary"). [Testimony of Jeffrey Weinman and Ex. FF.]

    9.    The LSC Estate obtained a default judgment in the KC Webb Adversary and obtained both real and personal property as a result of that judgment. [Case No. 08-01454 Docket Nos. 79 and 80.]

    10.    In the Breckenridge Mountain Estates Adversary, the Court found in Mrs. Watson's favor after a trial on the merits and dismissed the Watson Trustee's claims with prejudice. [Testimony of Jeffrey Weinman and Ex. FF at p. 9.]

    11.    The Blake Adversary and the Carbondale Adversary are pending. [Ex. A at pp. 1-2.]

*The Settlement Agreement*

    12.    In May 2011, the Trustees entered into a settlement agreement with BIP and its members (the "Settlement Agreement") in which the Trustees agreed to release their claims in the

Blake Industrial Adversary and the Carbondale Adversary proceedings in exchange for a portion of the proceeds of the sale by BIP of some of the Blake Industrial Park property at issue in the Blake Industrial Adversary (the "Blake Property").[1]  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. A.]

13. The Regional Transportation District ("RTD") agreed to purchase the Blake Property from BIP for $3,020,950.  [Testimony of Jeffrey Weinman and Ex. A at p. 2.]

14. After paying the first deed of trust and other closing costs for the sale of the Blake Property to RTD, the remainder of $1,958,363.69 was placed in escrow pending this Court's resolution of the Trustees' settlement. [Testimony of Jeffrey Weinman; Ex. JJ; and Ex. KK.]

15. After payment of an escrow fee, the Trustees agreed to two specified carve-outs before proceeds would be divided between BIP and the Trustees; the first of $50,000 to Mrs. Watson for re-payment of property taxes she had advanced over past years to preserve the Blake Property; and the second of $100,000 to BIP for estimated clean-up costs on the Blake Property before its sale to RTD.  [Testimony of Jeffrey Weinman and Simon Rodriguez, Ex. KK.]

16. After accounting for those carve-out payments, the net proceeds for division in the settlement were $1,804,863.69. [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. KK.]

17. After paying twenty-five percent of those net proceeds, or $451,215.90, to the Watson Estate for the Watson Trustee's interest as a member of BIP, the balance of $1,353,647.70 is to be, under the Settlement Agreement, split equally between BIP and the Trustees, representing a collective payment of $676,823.85 to the Trustees.  The Trustees agreed to split that amount evenly between the two estates, with each Trustee receiving $338,411.92. [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. KK.]

18. If the Settlement Agreement is approved, the Trustees will collectively receive $1,128,039.74, which represents a payment of $789,627.82 to the Watson Estate and a payment of $338,411.92 to the LSC Estate.  As a result of those payments, the Trustees will collectively receive sixty-three percent of the total net proceeds generated by the sale of the Blake Property to RTD.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. KK.]

19. Alpine Bank is the only creditor who objected to the proposed settlement.  The basis for its objection was, in part, that the Trustees had a good probability of prevailing on the fraudulent transfer claims in the Blake Industrial Adversary, and if the Trustees did prevail, they would receive a higher percentage of the money being held in escrow.  In addition, Alpine Bank objected to the two carve-outs to which the Trustees had agreed before splitting the proceeds from

---

[1] The Blake Property includes five separate parcels of real estate.  The Regional Transportation District ("RTD") agreed to purchase four of those five parcels, leaving the fifth parcel free and clear of liens in the name of BIP. [Ex. A at pp. 2- 4.]

3

RTD.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Case No. 08-15543, Docket No. 274.]

*Negotiations Surrounding the Payment to Cal-Three*

20.   As of May 4, 2011, the Trustees and BIP had a meeting of the minds concerning the material terms of the Settlement Agreement and were in the process of documenting that agreement.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. LL.]

21.   After that agreement was reached, BIP's counsel, on May 4, 2011, indicated for the first time that BIP believed the settlement with the Trustees would resolve Cal-Three's separate Section 523 action and asked the Trustees to confirm that understanding.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. LL at p. 2.]

22.   The Trustees disagreed with BIP's position and refused to resolve Cal-Three's separate action as part of the settlement they had reached with BIP, or to pay any portion of the estates' proceeds under the settlement to Cal-Three for dismissal of Cal-Three's Section 523 action.  Nonetheless, the Trustees did not want Cal-Three's action to prevent the Trustees and BIP from finalizing the Settlement Agreement.  The Trustees, therefore, contacted Cal-Three to request Cal-Three to voluntarily dismiss its Section 523 action so the Trustees could finish the Settlement Agreement.  If needed, the Trustees intended to file a motion with the Court to enforce what they believed was a binding agreement with BIP for the payments to the estates outlined above.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. LL. at p. 2.]

23.   Cal-Three refused to voluntarily dismiss its Section 523 action, so the Trustees informed BIP of that fact.  The Trustees told BIP that Cal-Three's action did not have any impact on the agreement between the Trustees and BIP.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. LL at p. 1.]

24.   Entirely separate from the Trustees, BIP then engaged in its own negotiations with RTD and Cal-Three to resolve Cal-Three's claims.  [Testimony of Patrick Vellone.]

25.   BIP and Cal-Three agreed that Cal-Three would dismiss its Section 523 action in exchange for a $100,000 payment from BIP.  BIP then convinced RTD to allow BIP to pay Cal-Three with the $100,000 that was previously carved out for BIP's clean-up efforts.  BIP did so by having its members separately agree to take responsibility for paying for clean-up work.  [Testimony of Patrick Vellone and Ex. MM.]

26.   On May 9, 2011, BIP informed the Trustees about its deal with Cal-Three and RTD.  The Trustees did not object to BIP using its $100,000 clean-up fund to settle Cal-Three's claim because that change did not diminish any property of the estates, would not adversely affect other creditors, and did not reduce the amount of money the Trustees would receive under the Settlement Agreement in any way.  [Testimony of Jeffrey Weinman and Simon Rodriguez and Ex. MM.]

4

27. To ensure full disclosure of the separate BIP/Cal-Three agreement, the Trustees informed the Court and creditors of the same in their respective motions to approve the Settlement Agreement. [Testimony of Jeffrey Weinman and Simon Rodriguez.]

*Trustees' Evaluation of the Merits of the Blake Industrial Adversary*

28. Prior to entering into the Settlement Agreement, the Trustees and their respective counsel undertook an extensive analysis of the strengths and weaknesses of the claims at issue in the Blake Industrial Adversary. On September 5, 2011, the LSC Trustee's counsel prepared a thoughtful and detailed memorandum summarizing the merits of the litigation, which the Court found highly persuasive. The Trustees confirmed the memorandum accurately presented the points they considered before entering into the Settlement Agreement. [Testimony of Jeffrey Weinman and Simon Rodriguez.]

29. As discussed in that memorandum, which was admitted into evidence as Hearing Exhibit B, BIP could present the following relevant evidence if the Blake Industrial Adversary went to trial: [2]

(a) In 1997, Watson's daughters, Stephanie and Nicole (the "Daughters"), started a company called National Real Estate Group, LLC ("NREG"). [Ex. F.]

(b) The Daughters prepared and executed the Articles of Organization for NREG and named themselves as the sole managers of that company. [Ex. F.] The Daughters also requested the Employer Identification Number for NREG. [Ex. I.]

(c) Before starting NREG, the Daughters had invested in real property. [Ex. D at pp. 2-3; Ex. L at p. 2; and Ex. Q. at p. LSC 2167.]

(d) The Daughters eventually sold their other real estate investments to fund NREG. NREG used the Daughters' funds to make the $67,000 down payment for the Blake Property and to pay subsequent expenses for that property. [Ex. D. at pp. 2-3; Ex. C.; Ex. L at p. 2; Ex. N at p. LSC 2520; and Ex. Q at p. LSC 2167.]

(e) Nicole Watson executed the purchase contract for the Blake Property on behalf of NREG. [Ex. G at p. 5.] Nicole Watson also executed the $5,000 earnest money promissory note for NREG's purchase of the Blake Property. [Ex. H.]

(f) In 2004, Watson's and the Daughters' development plans for the Blake Property fell through when the City of Denver refused to approve any development plans because the property had been targeted for eventual condemnation proceedings. At about the same time, the Blake Property began to operate at a loss due to escalating mortgage payments and decreased rental income. Watson and the Daughters needed to find additional capital to maintain the Blake Property in the hopes that an eventual condemnation would return the substantial investment they had made in that property. [Ex. E. at pp. 2-3; and Ex. N at p. LSC 2520.]

(g) Mrs. Watson began funding the operating shortfall for the Blake Property. Between 2004 and 2007, Mrs. Watson paid more than $273,000 to Watson or other related

---

[2] The Court acknowledges that neither Trustee deposed Stephanie Watson Kopet or Nicole Watson Bonato.

5

entities. [Ex. E at p. 2; Ex. J at p. BIP 227; Ex. L at p. 2; and Ex. N at pp. LSC 2511-2514, 2520, and 2525].  The Watsons would likely testify that these funds were used for Blake Property expenses. [Testimony of Jeffrey Weinman].

        (h)     On April 8, 2005, Watson and LSC transferred the Blake Property to BIP. [Ex. 6.]

        (i)     Watson, the Daughters, and Mrs. Watson each held a 25% membership interest in BIP.  The Daughters received their membership interest in exchange for their initial investment in the Blake Property through NREG, including NREG being the signatory on the mortgage for that property.  Watson received his membership interest in exchange for the years of cost-free management services he provided for the Blake Property.  Mrs. Watson received her membership interest in exchange for her past and contemplated payments of Blake Property expenses. [Ex. E; Ex. L at p. 2; Ex. N at p. LSC 2520; Ex. Q at p. 4; and Ex. 20.]

        (j)     When Watson and LSC transferred the Blake Property to BIP, Alpine Bank had not yet brought claims against Watson or LSC.  Alpine asserted a counterclaim against Watson on August 30, 2005, in the Stan Miller, Inc. litigation. [Ex. 2 at p. 6.]

        (k)     LSC also continued to conduct its usual management business and to acquire additional real estate after it and Watson transferred the Blake Property to BIP.  On October 7, 2005, LSC paid over $3 million to acquire property located at 1700 Kendall Street, Englewood, Colorado. [Ex. Y at p. 1.]  In April 2006, LSC acquired four other apartment complexes in Colorado. [Ex. W at p. 1; Ex. X at p. 1; and Ex. Z at p. 1.]

        (l)     On June 13, 2006, Cal-Three obtained a judgment against Watson and LSC, jointly and severally, in the amount of $1,197,326.55. [Ex. V.]

        (m)     On June 15, 2006, LSC transferred four apartment complexes to an entity controlled by Watson's sister for little or no consideration.  Watson attempted to back-date several of the quit claim deeds to 2005, but LSC did not own any of those apartment complexes until April 2006. [Ex. W at p. 2; Ex. X at p. 3; Ex. Z at p. 2; and Ex. GG at pp. 9-10.]

        (n)     On June 19, 2006, Watson transferred his interest in a rental house in Carbondale, Colorado to his wife for little or no consideration. [Ex. DD at p. 2.]  On that same day, Watson also transferred his interest in a rental home in Denver, Colorado to his sister's company, Community Rental Services, for little or no consideration. [Ex. AA.]

        (o)     In August 2006, Watson began shutting down LSC's business operations and transferring its management operations to Skyline Estates while also giving away LSC's other assets. [Ex. B at pp. 8-9; and Ex. BB.]

     30.     The Trustees believed that they could not present any evidence to disprove BIP's explanation of the history behind BIP's formation and eventual receipt of the Blake Property.  Instead, the Trustees could only succeed in the Blake Industrial Adversary by discrediting BIP's witnesses. [Testimony of Jeffrey Weinman and Simon Rodriguez.]

     31.     Regarding their claim for constructive fraud, the Trustees would likely need expert testimony regarding Watson's and LSC's insolvency at the time of the transfer to BIP to prove this claim. [Testimony of Jeffrey Weinman and Simon Rodriguez.]

     32.     After thoroughly evaluating their claims and the evidence they believed BIP would present at trial, the Trustees testified that they had determined their chances of succeeding on the

6

merits against BIP were likely less than fifty percent.  In addition to the case hinging on witness credibility alone, the Trustees were also concerned about the timeline that could be presented by BIP and by the comparisons between the Blake Industrial Adversary and the Breckenridge Mountain Estates Adversary in which the Watson Trustee lost at trial.  [Testimony of Jeffrey Weinman and Simon Rodriguez.]

33. As noted by the Trustees, the timing of the transfer to BIP undercuts the Trustees' theory of fraudulent intent.  [Testimony of Jeffrey Weinman and Simon Rodriguez.]

34. The Trustees also noted that the adverse outcome in the Breckenridge Mountain Estates Adversary made a successful outcome in the Blake Industrial Adversary less likely for the following reasons:

(a) Witness credibility was an issue in the Breckenridge Mountain Estates case, and the Court found Valdonna Watson and Watson both to be credible witnesses despite impeachment efforts by the Watson Trustee's counsel.  This was particularly troubling for the Trustees because they intended to use similar impeachment materials in the Blake Industrial Adversary to those used unsuccessfully in the Breckenridge Mountain Estates Adversary.  [Testimony of Jeffrey Weinman and Simon Rodriguez.]

(b) The Trustees would be able to prove fewer "badges of fraud" in the Blake Industrial Adversary than the Watson Trustee established in the Breckenridge Mountain Estates Adversary.  The Trustees could not prove that Watson or LSC concealed the transfer to BIP.  The Trustees also might not be able to prove the BIP transfer occurred shortly before the transferor incurred a substantial debt.  The transfer at issue in the Breckenridge Mountain Estates Adversary took place three months before the Cal-Three judgment was issued.  The BIP transfer, however, took place fourteen months before that judgment.  In the Blake Industrial Adversary, the Trustees would only be able to prove, at most, four badges of fraud.  [Testimony of Simon Rodriguez.]

### *The LSC Trustee's Evaluation of the Merits of the Carbondale Adversary*

35. The LSC Trustee testified credibly about the difficulties the LSC Estate would have recovering any funds if the Carbondale Adversary were to go to trial.  There are factual, legal, and practical impediments to any such recovery.  [Testimony of Simon Rodriguez.]

36. The defendant in the Carbondale Adversary likely would provide a non-fraudulent reason for the transfers at issue in that case.  Specifically, Mrs. Watson would testify that she paid fair market value for the houses at issue and spent years paying the expenses for those properties before she received them from LSC.  [Testimony of Simon Rodriguez.]

37. Even if the Court found in the LSC Trustee's favor in the Carbondale Adversary, that success would not guarantee a recovery for the LSC Estate.  The properties at issue in the Carbondale Adversary have no equity remaining, so the LSC Estate intended to ask the Court to award the LSC Estate a money judgment for the value of the equity in the properties at the time of the allegedly fraudulent transfers, rather than awarding the LSC Estate title to the properties.

7

Whether to award a money judgment is a matter left to the sound discretion of the Court, and the Trustees could not guarantee that the Court would grant such a judgment. [Testimony of Simon Rodriguez.]

38.     If the LSC Trustee succeeded on the merits in the Carbondale Adversary and convinced the Court to award a money judgment rather than awarding title to the properties at issue, the LSC Estate would still, in all probability, have practical difficulties collecting on that money judgment. Mrs. Watson's counsel has indicated to the LSC Trustee's counsel that Mrs. Watson would likely file for bankruptcy protection if the LSC Trustee obtained a significant money judgment against Mrs. Watson. Under these circumstances, the LSC Trustee believes it would be difficult, if not impossible, to collect on a money judgment against Mrs. Watson. [Testimony of Simon Rodriguez.]

## **CONCLUSIONS OF LAW**

The Trustees seek approval of the Settlement Agreement under 11 U.S.C. § 105 and Fed.R.Bankr.P. 9019. Fed.R.Bankr.P. 9019 provides that, after a hearing and notice to creditors, the Court may approve a compromise or settlement. The law generally favors compromises and settlements of disputes between parties. See Stanspec Corp. v. Jelco, Inc. 464 F.2d 1184, 1187 (10th Cir. 1972).

"The decision of a bankruptcy court to approve a settlement must be an informed one based upon an objective evaluation of developed facts." Kopp v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.), 213 B.R. 1020, 1022 (B.A.P. 10th Cir. 1997) (citation omitted). The following factors guide the Court's determination of whether a settlement agreement should be approved: (1) the probability of success of the underlying litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors in deference to their reasonable views. Id.

Alpine Bank argues the Trustees have a strong probability of succeeding on the merits in the Blake Industrial Adversary and that the Settlement Agreement does not properly account for the interests of the estates' creditors. The Court disagrees and finds that the Kopexa Realty factors support approving the Settlement Agreement.

8

A. **THE SETTLEMENT AGREEMENT PROPERLY ACCOUNTS FOR THE TRUSTEES' LIKELIHOOD OF SUCCEEDING ON THE MERITS IN THE UNDERLYING ADVERSARY PROCEEDINGS.**

The Settlement agreement resolves both the Blake Industrial Adversary and the Carbondale Adversary. In their business judgment as experienced trustees before this Court, the Trustees contend they likely have less than a fifty percent chance of succeeding in either of those cases. The Court agrees.

1. **The Trustees Would Have Difficulty Winning the Blake Industrial Case**

In the Blake Industrial Adversary, the Trustees assert both intentional and constructive fraudulent conveyance claims under Colorado law. The LSC Trustee also asserts a reverse piercing alter ego claim. The Trustees would need to overcome significant hurdles to establish any of those claims.

a. **The Trustees May Not Succeed on Their Intentional Fraudulent Conveyance Claims**

A party commits an intentionally fraudulent transfer when the party transfers property with the actual intent to hinder, delay, or defraud creditors. See C.R.S. § 38-8-105(1)(a). The Trustees would bear the burden of proving the specific intent to hinder, delay, or defraud creditors. See Schempp v. Lucre Mgmt. Group, LLC, 75 P.3d 1157, 1165 (Colo. App. 2003). To prove intent, the Trustees may establish the existence of various "badges of fraud" set forth in Colorado's Uniform Fraudulent Transfer Act ("CUFTA"). The Court weighs the existence or non-existence of the badges of fraud and considers all other indicia negating as well as suggesting fraud to determine whether a transfer was made with fraudulent intent. See Id.; Land O'Lakes, Inc. v. Schaefer, 3 Fed.Appx. 769, 772 (10th Cir. 2001).

CUFTA sets forth the following badges of fraud: (1) the transfer was made to an insider; (2) the transferor remained in control of the property after the transfer; (3) the transfer was concealed; (4) the transferor had been sued or threatened with suit shortly before the transfer; (5) the transfer constituted all or substantially all of the transferor's assets; (6) the transferor absconded; (6) the transferor concealed assets; (7) the transferor received less than reasonably equivalent value for the property; (8) the transferor was insolvent or became insolvent shortly after the transfer; (9) the transfer occurred shortly before or after a substantial debt was incurred; and (10) the transferor transferred essential assets to a lienor, who in turn transferred the assets to an insider of the transferor. See C.R.S. § 38-8-105(2).

At best, the Trustees will be able to prove only four of the ten possible badges of fraud. The Trustees can prove the BIP transfer was to an insider, that the transferor remained in control of the property after the transfer, and that the transferor had been sued before the transfer occurred. The Trustees could possibly argue the BIP transfer occurred shortly before a substantial debt was incurred, as the BIP transfer occurred in April 2005 and Alpine asserted a

9

claim against Watson in August 2005, but Alpine did not receive partial summary judgment until November 2006. With the ability to prove, at best, four badges of fraud, the Trustees concluded they would have a difficult time establishing an intentional fraudulent conveyance.

The history of the BIP transfer also buttresses BIP's defense. The primary basis for the Trustees' claims, and a point upon which Alpine Bank focused during the hearing, is that Watson and LSC did not receive any consideration from BIP in exchange for transferring the Blake Property to BIP. While on its face this argument seems to support the Trustees' fraudulent transfer claims, the argument ignores the history of the Blake Property ownership. Most importantly, Watson did not pay anything to receive his ownership interest in the Blake Property. NREG took on the mortgage obligation and made the down payment for the Blake Property and then later transferred that property to Watson for zero dollars. It is not surprising, therefore, that Watson subsequently transferred the property to an entity owned by NREG's principals without requiring payment for that transfer. The evidence arguably supports the conclusion that Watson made that transfer to fulfill an antecedent promise to NREG and its principals, the Daughters.[3]

Alpine Bank argues that Watson used NREG to hide his assets from creditors, and that the Trustees could establish their fraudulent transfer claims by proving that point. However, it would be difficult for the Trustees to successfully argue that Watson used NREG, starting in 1997, to hide assets from creditors who would not even bring their claims against Watson or LSC until much later, and who did not obtain any judgments against Watson or LSC until June 2006. Adding to the problems with that position is the fact that NREG held only one asset, the Blake Property, and the fact that Watson himself held record title to the Blake Property from 2001 through April 2005. If Watson intended to use NREG as a vehicle for hiding his assets from creditors, he would have put other assets into that company and would not have taken the Blake Property out of that entity to hold title in his own name for four years.

---

[3] LSC did pay a small amount for the portion of the Blake Property it owned. That parcel, however, was not purchased by RTD and can be recovered by the LSC Estate if the Court approves the Settlement Agreement. See Ex. A at p. 4. Whether LSC could succeed on its fraudulent transfer claim in the Blake Industrial Adversary is, therefore, irrelevant to the Court's analysis of the propriety of the Settlement Agreement as LSC could obtain the same relief through the Settlement Agreement as it could receive through trial.

10

>    **b.     The Trustees Will Likely Not Succeed on Their Constructive Fraudulent Transfer Claims Against BIP**

If a party cannot establish actual fraudulent intent behind a transfer, the party may still prove the transfer was constructively fraudulent. See C.R.S. § 38-8-105(1)(b). To do so in this case, the Trustees would need to prove that LSC and Watson did not receive reasonably equivalent value in exchange for the Blake Property and that they believed or should have believed, at the time of the transfer, that they would incur debts beyond their ability to pay as they came due. See id. "This test measures whether the debtor, as a going concern, would reasonably have been able to pay its debts after making the questionable transfer." CB Richard Ellis, Inc. v. CGLP, LLC, 251 P.3d 523, 531-32 (Colo. App. 2010). This would require an analysis of Watson's and LSC's assets at the time of the Blake Property transfer. Proving a Section 105(1)(b) claim is typically established "through the use of cash flow projections and other forward-looking sources of evidence." Id. at 533.

The Trustees cannot present evidence about Watson and/or LSC's financial condition on April 8, 2005 when they transferred the Blake Property to BIP. The Trustees did not have funds available to pay an expert witness to perform an insolvency analysis or to opine about the adequacy of Watson's and/or LSC's assets following the Blake Property transfer. Without such an analysis, the Trustees are unlikely to establish whether Watson and LSC were capable of paying their debts as they came due following the allegedly fraudulent Blake Property Transfer, and therefore, are unlikely to succeed on their constructive fraud claims. See id.

### 2. **The LSC Trustee Would Have Difficulty Succeeding on the Merits in the Carbondale Adversary**

Alpine Bank has not argued the LSC Trustee would be likely to succeed in the Carbondale Adversary, and Alpine Bank has not presented any evidence regarding the viability of the claims at issue in that case. The Court, therefore, accepts the LSC Trustee's uncontroverted testimony regarding the difficulties he would encounter in the Carbondale Adversary, and the Court agrees with the LSC Trustee's assessment of a less than fifty percent chance of success in that case.

### B. **THE LSC TRUSTEE WOULD LIKELY HAVE DIFFICULTY COLLECTING ON A JUDGMENT AGAINST MRS. WATSON**

The LSC Trustee testified credibly about why it would likely be difficult for the LSC Estate to recover on any judgment entered against Mrs. Watson in the Carbondale Adversary. This testimony was uncontroverted and the Court, therefore, finds that this Kopexa Realty factor weighs in favor of approving the Settlement Agreement in the LSC case.[4]

### C. **THE EXPENSE AND INCONVENIENCE FACTOR WEIGHS IN FAVOR OF APPROVING THE SETTLEMENT AGREEMENT**

The Trustees and their respective estates will experience expense and inconvenience if the Court rejects the Settlement Agreement. There is currently no scheduled trial date for either the Blake Industrial Adversary or the Carbondale Adversary. The Trustees will also incur significant expenses if the pending adversary proceedings go to trial. The Watson Trustee's counsel is being compensated on an hourly basis, and the Watson Estate will have significantly higher legal fees if the Watson Trustee is forced to prepare for and prosecute what was originally scheduled to be a four-day trial in the Blake Industrial case. If the Trustees prevail, an appeal by BIP would be a reasonable prospect and would cause yet additional expense and delay to the estates. The LSC Trustee will also incur litigation costs, and any increased recovery for the LSC Estate will not be a dollar-for-dollar recovery because the LSC Trustee's counsel is working on a contingency basis. Therefore, for every additional dollar above the settlement amount that the LSC Trustee recovers through trial, only a portion of that additional recovery will come back to the estate.

Alpine Bank has not disputed that the Trustees will incur additional expenses to try the pending adversary cases or that awaiting those trials and the outcome of any appeal will cause an inconvenience to the bankruptcy estates. Accordingly, the Court finds that this Kopexa Realty factor weighs in favor or approving the Settlement Agreement.

---

[4] The Trustees would not have any difficulty collecting a judgment in the Blake Industrial Adversary because the funds at issue in that case cannot be released from escrow without a Court order.

12

### D.     THE SETTLEMENT AGREEMENT IS IN THE BEST INTERESTS OF THE ESTATES' CREDITORS

Alpine Bank argues the Settlement Agreement is not in the creditors' best interests for two reasons. First, Alpine Bank asserts the Settlement Agreement does not adequately compensate the Trustees for resolving the fraudulent transfer claims in the Blake Industrial Adversary, which Alpine Bank believes are strong claims. Second, Alpine Bank contends the Settlement Agreement allows Cal-Three to take funds that should otherwise go to the estates. The Court rejects both of these arguments.

The Settlement Agreement adequately compensates the Trustees. As discussed in detail above, the Court agrees with the Trustees' conclusion that the Trustees have less than a fifty percent chance of succeeding on the merits in either the Blake Industrial or Carbondale Adversary cases. The Settlement Agreement provides the Trustees with approximately $1.1 million, which represents sixty-three percent of the net proceeds from the sale of the Blake Property to RTD. See Ex. KK. That payment more than adequately compensates the Trustees for releasing claims they had less than a fifty percent chance of winning.

The Settlement Agreement does not allow Cal-Three to take funds that belong to the bankruptcy estates. The evidence presented shows the Trustees had agreed to a $100,000 carve-out for paying clean-up fees at the Blake Property long before BIP raised the issue concerning Cal-Three's Section 523 action. The Trustees did not agree to any payment to Cal-Three from their portion of proceeds from the BIP sale. Any agreement between BIP and Cal-Three is entirely separate from the Trustees and is not presented for approval by the Trustees' pending Motions. There is no evidence that the estates are diminished by any BIP payment to Cal-Three, and if anything, the estates would be benefitted by the payment to Cal-Three because that payment may reduce the amount of Cal-Three's claims against the estates. From the Trustees' perspective, the $100,000 carve-out was to be paid to BIP as part of the settlement and the Trustees were not concerned with whether BIP used that money to pay for clean-up services, to pay Cal-Three, or for any other purpose. The Trustees were only concerned about whether they were receiving adequate compensation under the Settlement Agreement. Likewise, the Court's task here is to evaluate whether the approximately $1.1 million payment to the Trustees represents a fair settlement that is in the creditors' best interests; the Court is not charged with evaluating how BIP and its members will spend the money they retain under the Settlement Agreement.

The Court concludes the Settlement Agreement provides the Trustees with compensation that is commensurate with the value of the claims they are releasing under that agreement. The Court further concludes the Settlement Agreement is in the best interests of the creditors of the LSC and Watson Estates.

## **ORDER**

Based on the Findings of Fact and Conclusions of Law set forth above, the Court ORDERS:

1. The Motions are GRANTED;
2. The Settlement Agreement is APPROVED; and
3. Within fourteen days from this Order becoming a final order, the Trustees shall file motions to dismiss in the related adversaries.

DATED this 19th day of December, 2011.

BY THE COURT:

*[signature: Elizabeth E. Brown]*
_____
Elizabeth E. Brown
United States Bankruptcy Judge

14